UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                            **REPORT AND**
                                            **RECOMMENDATION**

v.

                                            12-CR-103-WMS-JJM-3

TYRONE BROWN,
                             Defendant.
_____

          Defendant Tyrone Brown is charged in a Fourth Superseding Indictment [139],[1]

with, *inter alia*, committing a violent crime in aid of racketeering for the June 14, 2011 murder of

Kevin Wilkins, in violation of 18 U.S.C. §§1959(a)(1) and 2 (id., Count 8).  Brown was allegedly

identified by a witness from a photo array and photo book on April 30, 2012, as the individual

who shot Mr. Wilkens.

          Before me is Brown's motion to suppress the witness's pretrial identifications and

anticipated identification of him at trial.  Musitano Affirmations [225], pp. 34-36, ¶¶70-76;

[270], pp. 4-6, ¶¶8-15.  A hearing was held on December 19, 2014 and June 9, 2015, at which

City of Buffalo Police Detective Brian Ross and FBI Special Agent ("SA") Michael McElhenny

testified for the government [434, 470]. Following the hearing, the parties submitted post-hearing

briefs [472, 490, 491], and oral argument was held before me on October 14, 2015 [492].

_____
     [1]        Bracketed references are to the CM/ECF docket entries.

## BACKGROUND

### A.      Hearing Testimony

Detective Ross testified that in or around November 2011 he became  involved in the follow-up investigation of Mr. Wilkins' June 14, 2011 homicide  that took place on Minnesota Avenue in the City of Buffalo. December 19, 2014 hearing transcript [434], pp. 6, 19. On the day of the shooting, the witness, who was then 14 years old, provided a sworn statement that as the vehicle, in which he and Mr. Wilkins were passengers, was

> "driving down Minnesota, and just before we hit Suffolk Ave., I saw a large gang of kids, about 25 of them, out the right side of the car, on the sidewalk.  I then saw *a tall black male, dark skinned, about 19 to 20 years old med build, wearing a light colored shirt, and a dark fitted baseball cap*, step away from the crowd, and onto the grass, between the sidewalk and street.  He did not say anything he just pulled out a handgun, and started shooting at the car.  He shot about six times, I ducked down". Def. ex. B [371-3], p. 1 of 2 (emphasis added).

The witness provided no description of the suspect's facial features. [434], pp. 30-31.

On April 29, 2012 Detective Ross's partner, Detective Scott Malec, reached out to the witness and told him that they were going to bring him in for "a pre-grand jury debrief, in essence", but Detective Ross was not present for that conversation and did not know what was said (id., pp. 7, 22-23).  On the following day, the witness was picked up by Detectives Ross and Malec and brought to an 8' by 8' conference room at the Erie County District Attorney's Office, where the detectives and witness were joined by Assistant District Attorney John Feroleto and then SA McElhenny approximately five minutes later (id., pp. 7-8).  No parent or other adult accompanied the witness, whom Detective Ross described as a "young kid" (id., p. 29). Detective Ross testified that "[a]s soon as all parties were in the room, I did the photo array first" (id., p. 9). Prior to that, there was no case-related conversation (id., pp. 8-9).

Case 1:12-cr-00103-WMS-JJM   Document 498   Filed 11/03/15   Page 3 of 15

The six person photo array (gov. ex. 1 [371-1]) was created by Detective Ross on January 19, 2011 at the request of others in the Buffalo Police Homicide Unit, who were "investigating the homicide of . . . Harold McCain and . . . developed Mr. Brown as a possible suspect in that case". [434], pp. 9-10, 20-21.  Detective Ross had conducted over 100 photo array identifications in his 18-year career with the Buffalo Police Department (id. pp. 6-7)

Detective Ross compiled the array (gov. ex. 1 [371-1]) based solely on the information from the McCain homicide (id., p. 26).   The following parameters were used in creating the array: "black males, an approximate age range, short cropped hair with a defined hairline, similar sized lips, similar sized noses" (id., p. 12).  Detective Ross testified that he "was obviously trying to find people with different complexions" (id., p. 25). He did not modify the array thereafter "[b]ecause it was sufficient to show another witness, in essence, a years and a half later without any changes" (id., pp. 26, 32). Before presenting the array to the witness, he read the following instructions verbatim from the array:

> "Carefully look at all the photographs before you make any decision. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated.  Keep in mind that hair styles, beards and moustaches may be easily changed. Also, photographs may not depict the true complexion of a person.  When you have looked at all the photos, answer the questions below." (id., pp. 13, 29; gov. ex. 1 [371-1]).

Detective Ross then placed the array face down on the table and asked the witness to turn it over when he was ready. [434], p. 13.  Upon turning over the array, the witness scanned it for approximately 15 seconds before identifying Brown (in photo no. 3) as the individual who shot Mr. Wilkins (id., p. 14). The witness then completed the three questions at the bottom of the array and signed it (id., p. 15; gov. ex. 1 [371-1]).

Detective Ross testified that prior to the identification, he did not tell the witness that they had any suspects in the case,  suggest to him whom he should select, or provide him with any hints. [434], pp. 16-17, 28-29.  Detective Ross conceded that the individual with the darkest complexion and background in the array was Brown (id., pp. 21-22, 34).  He attributed this to the aperture of the photograph (id., p. 32). Detective Ross explained, "I could not find in the machine a person with the exact same complexion and the exact same background as Mr. Brown, so taking care to not be overly suggestive I placed as many different backgrounds as possible, as many different complexions as possible to draw your attention to almost any other place on the page other than Mr. Brown's picture" (id., p. 33).   He also acknowledged that the array did not depict many of the characteristics of the suspect given by the witness on June 14, 2011, including height or build (id., p. 27).   All of the individuals depicted were also wearing different colored shirts and none wore a hat (id.).

After the witness made the identification from the  photo array,  SA McElhenny showed the witness a book of photographs of 64 individuals, all young black males associated with the Bailey-Minnesota gang (the "gang book") that had been compiled by the Buffalo Police Department.  June 9, 2015 hearing transcript [470], pp. 10-12, 24; gov. ex. 3 [460].  "BAILEY/ MINNESOTA GANG PHOTOS (MEMBERS AND ASSOCIATES)" was written on the cover of the gang book, but SA McElhenny testified that he did not know whether the witness knew that Mr. Wilken's murder was a mistaken gang-related shooting. [470], p. 21; gov. ex. 3 [460]. SA McElhenny instructed the witness, who had no connection to the gang,  to go through the book page-by-page to see if he recognized anyone. [470], pp. 13, 15.  However, he testified that they did not believe that the witness had relevant information about the gang (id., pp. 20, 53).

SA McElhenny also denied that the review of the gang book was intended to test whether the witness could identify Brown, since he already identified him from the photo array (id., pp. 40, 47).  The gang book, which was typically in SA McElhenny's possession, was shown to every person they interviewed (id., pp. 20, 34, 39).

It took the witness between four to five minutes to review the entire book and identify Brown at page 17 (id., pp. 13, 15).  The witness said, "That is the individual that's in the photo array" and that he was the individual who shot Mr. Wilkens (id., pp. 14-15, 40, 55).  The photograph of Brown in the gang book was different from the photograph of him in the photo array (id., p. 22).

**B**.        **Brown's Requests to Obtain and Present Additional Evidence**

On March 27, 2015 Brown's attorney, Angelo Musitano, advised that, for reasons unrelated to this case, he was unable to continue representing Brown, and I appointed attorney Mark Mahoney to replace him [407].[2]  Upon taking over the case on March 27, 2015, Mr. Mahoney moved for supplemental discovery [428], which I initially granted to the extent that it sought production of the six individual digital photographs used for the photo array, but otherwise denied.  May 14, 2015 Text Order [445].  At a subsequent conference requested by Brown, I rescinded my earlier order to the extent that it directed  production of the six digital photographs used for the photo array and, in lieu of that production, ordered the government to

_____

[2]        Mr. Mahoney had previously served as Brown's learned counsel until the government notified the court on July 24, 2013 that it would not be seeking the death penalty against him.  July 24, 2013 Text Order [180].

produce 100 color copies of the photo array without any markings or handwriting. May 18, 2015 Text Order [449].

In addition to seeking supplemental discovery, at the conclusion of the June 9, 2015 hearing, Mr. Mahoney indicated that he intended to call "a psychologist to testify about the factors relating to the reliability of identification procedures". [470], p. 57.  Believing that I had a sufficient record before me to decide the motion, I denied Mr. Mahoney's request to call an additional witness, subject to the possibility of reopening the hearing upon consideration of the parties' post-hearing briefs.

Although I permitted the parties to address "whether consideration of additional evidence is necessary" in their post-hearing briefs  (June 9, 2015 Text Order [462]), on the deadline for Brown's post-hearing brief, Mr. Mahoney moved to reopen the hearing to present additional evidence [478], which was supported by an *in camera* submission [481].  I denied that motion, and granted him a two-week extension to file his post hearing submission. September 16, 2015 Text Order [482].

## ANALYSIS

"If there is a very substantial likelihood of irreparable misidentification [from a pretrial identification],  the judge must disallow presentation of the evidence at trial." Perry v. New Hampshire, ___U.S. ___, 132 S.Ct. 716, 720 (2012).  Determining whether a witness will be permitted to "identify the defendant at trial normally requires a one-step or two-step inquiry. The first question is whether the pretrial identification procedures were unduly suggestive of the suspect's guilt.  If they were not, the trial identification testimony is generally admissible without

further inquiry into the reliability of the pretrial identification.  In that circumstance, any question as to the reliability of the witness' identifications goes to the weight of the evidence, not its admissibility." United States v. Maldonado  Rivera, 922 F.2d 934, 973 (2d Cir. 1990), cert. denied, 501 U.S. 1211 (1991).  However, "[i]f the pretrial procedures were unduly suggestive, the analysis requires a second step; the court must then weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures". Id.

"In determining whether the identification procedure was impermissibly suggestive, defendant bears the burden of proof by a preponderance of the evidence." United States v. Roberts, 928 F.Supp. 910, 927 (W.D.Mo. 1996); United States v. Brown,  2006 WL 3041085,  *5 (D.N.J. 2006), aff'd, 306 Fed. App'x 719 (3d Cir. 2009) "It is only after a defendant meets this burden of proof that the burden then shifts to the prosecutor to prove that the identification was reliable independent of the suggestive identification procedure." United States v. Campbell, 609 F. Supp. 2d 674, 692 (E.D. Mich. 2009).

### A.      Was the Photo Array Impermissibly Suggestive?

To determine whether a photo array is unduly suggestive, the court must consider "the size of the array, the manner of presentation by the officer, and the array's contents." Maldonado  Rivera, 922 F.2d at 974.  Based on the current record before me,  Brown's challenge is to the array's contents.  In addressing that challenge, I must decide "whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other

photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit." Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986).

        Brown argues that the array was impermissibly suggestive because he "stood out as the darkest skinned person for a witness whose only pertinent description of the suspect was dark skinned". Brown's Post-Hearing Brief [490], p. 7. "Due process does not require that the fillers . . . be nearly identical to a defendant." United States v. Hill, 2013 WL 3243657, *9 (E.D.N.Y. 2013). However, "a lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not. Lineups in which suspects are the only participants . . . matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." Raheem v. Kelly, 257 F.3d 122, 134 (2d Cir. 2001), cert. denied, 534 U.S. 1118 (2002).[3] See also United States v. Wong, 40 F.3d 1347, 1359 - 60 (2d Cir. 1994) ("When the appearance of participants in a lineup is not uniform . . . the principal question in determining suggestiveness is whether the appearance of the accused, matching descriptions given by the witness, so stood out from all of the others as to suggest to an identifying witness that that person was more likely to be the culprit" (emphasis omitted)).

        "A lineup may be suggestive to one viewer even though it is not to another." Raheem, 257 F.3d at 134. For example, "[w]here one witness has emphasized a particular

---

     [3]      "Generally, the same considerations for determining suggestiveness used in analyzing lineups apply to photographic arrays as well". 1 Criminal Practice Manual §29:7 (Westlaw 2015).

characteristic of the perpetrator in giving a description to the police, a lineup in which only the defendant has that characteristic may well taint the identification of the defendant only by that viewer." Id.

For the first time in its reply, the government points to the fact that there is no "evidence that the police 'rigged' the array during its preparation". Government's Post-Hearing Memorandum in Response [491], p. 2. It argues that without such evidence, "the reliability of the identification is a jury issue". Id. That argument is unsupportable. "As our case law makes clear, what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, *whether or not they intended the arranged procedure to be suggestive*." Perry, 132 S. Ct. at 721, n. 1 (emphasis added).

Here, the witness provided a very limited description of the suspect, identifying him by only three traits that were depicted in the array:   black male, dark skinned, and approximately 19 to 20 years old.   While there is no indication that the witness expressly emphasized one trait over the other, his limited description lent added significance to each of the traits he identified. Although all of the six individuals depicted in the array are black  teen males, they all do not have the same skin tone.  While the government argues that Brown "is slightly darker than the five others" and that the "contrasts between [Brown] and the five fillers is . . . insignificant" (government's Post-Hearing Memorandum of Points and Authorities [472], pp. 3, 7), this is not borne out by the array in which Brown's skin tone is *appreciably* darker than the others in array,  thereby making him appear as the only dark skinned individual - and the only individual fully matching the witness's limited description.

Brown also argues that his photo "jumps off the page". Musitano Affirmation [270], p. 6, ¶15.  "[U]nder certain circumstances, differences in backgrounds or complexions may 'draw the viewer's eye' to a particular photograph creating the possibility that the photographic array is unduly suggestive".  United States v. Williams, 2015 WL 429087, *17 (W.D.N.Y.) (Payson, M.J.), adopted, 2015 WL 3454430 (W.D.N.Y. 2015) (Geraci, J.). See United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir.), cert. denied, 513 U.S. 1007 (1994) ("When a relatively low number of photographs are used in an array, minor differences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eyes to that picture. Common sense dictates that slight irregularities are more likely to 'jump out' at a witness reviewing a single sheet of paper with only six photographs on it than at a witness reviewing a large mug book containing hundreds of photographs. Upon continued inspection, the witness may begin to believe that the 'oddball' picture was taken under different circumstances than the others. This fact can suggest a number of things to the witness, the most dangerous of which is that the similar pictures were taken together to form a pool or control group, and that the one picture that stands out is the suspect"). While "[s]light variations in complexion tone, . . . d[o] not create an unconstitutionally suggestive pre-trial identification",  Agosto v. Kelly, 1989 WL 79484,  *3 (E.D.N.Y. 1989), the variation in skin tone between Brown and the others in the array is far from slight.

The suggestive nature of the array is exacerbated by the fact that the background of Brown's photograph is the darkest in the array.  In stark contrast to the uniform brightness of the other images, his photograph is exceptionally dark - so much so that it difficult to discern his facial features as compared to the others in the array.  When contrasted against the other

-10-

photographs in the array, the dark hue of his photograph causes him to stand out sharply in the

array such that a witness would be unduly influenced in his identification. *See* United States v.

Saunders, 501 F.3d 384, 390 (4th Cir. 2007), cert. denied, 552 U.S. 1157 (2008) (Defendant's

"photo stood out sharply from the others in the array. The dark background and lack of overhead

lighting in [defendant's] photo distinguished it from the remaining five photos, all of which had

light backgrounds and overhead lighting . . . . The differences that caused [defendant's] photo to

stand out were quite marked, yielding potentially problematic consequences. The dark

background and lack of lighting in [defendant's] photo gave him a menacing countenance that

was lacking in the men in the other five photos"); United States v. Friedman, 1996 WL 612456,

*27 (E.D.N.Y.1996), aff'd in part and rev'd in part on other grounds, 300 F.3d 111 (2d Cir.

2002), cert. denied, 538 U.S. 981 (2003) ("When Friedman's pale complexion and the

background are viewed in conjunction, the effect is quite striking. Friedman's photograph stands

out in both arrays in a manner that is extremely distinctive. The differences are sufficiently stark

as to suggest to anyone who viewed the array that Detective Lancaster was seeking a particular

target, and that Friedman was that target"). Therefore, notwithstanding the instructions read to

the witness that the array "may not depict [an individual's] true complexion" (gov. ex. [371-1]), I

conclude that the array is impermissibly suggestive.

　　　　　I recognize that Judge Skretny previously differed with me on the suggestiveness

of a photo array identification challenged by co-defendant Raymel Weeden.  There, the suspect

was described as a teen African American male with dark skin and "a little mustache and small

bush".  October 16, 2014 Report and Recommendation [349], pp. 2-3.  I recommended that the

identification be suppressed, concluding that "[w]hereas multiple individuals in the array match

the witness's general description . . . Weeden is the only individual with the distinguishing

feature of a clearly identifiable mustache" (id., p. 11).   My recommendation was rejected by

Judge Skretny, who concluded that "at least four of the photographs . . . depict individuals who at

least *appear* to have 'little mustaches'",  but that "[e]ven if one were to conclude that Weeden's

mustache is more recognizable than the others, there is nothing about Weeden's photograph

overall, when considering the five relevant traits described by the witness *in toto*, that makes it

impermissibly stand out from the rest, such that Weeden meets the description of the perpetrator

and the other filler photographs obviously do not".  June 8, 2015 Decision and Order [463], p. 6

(emphasis in original).

> While I am mindful of Weeden, "[t]he evaluation of whether an array is

suggestive must be made on a case-by-case basis".  Friedman, 1996 WL 612456, *27.  Whereas

it was debatable whether Weeden was the only individual with a mustache, here it is indisputable

that Brown is the darkest individual.  By contrast to Weeden, here the suggestiveness of the array

is enhanced by the background and overall darkness of Brown's photograph when compared to

the others in the array.  Therefore, I conclude that nothing in Judge Skretny's decision in Weeden

precludes my conclusion that the photo array here was unduly suggestive.


**B.      Did the Suggestiveness of the Photo Array Taint the Gang Book Identification and
         Were the Identifications Otherwise Reliable?**

> Brown argues that suggestiveness of the photo array tainted the witness's

identification from the gang book. Brown's Post Hearing Brief [490], p. 23.  The government

does not appear to dispute that argument.  Instead, it  relies on the witness's identification of

Brown's photograph, (a photograph different from that used in the array) from the 64 individuals

contained in the gang book, to argue that "the reliability of [the witness's] out-of-court identification of the defendant is unassailable". Government's Post-Hearing Memorandum of Points and Authorities [472], p. 7.

In determining whether a tainted identification is independently reliable, courts consider the following factors: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199-200 (1972).  Here, even with the witness's second corroborating  identification of Brown on April 30, 2012, the government has failed to establish that there was any independent reliability to either identification.   By his own account, the witness, who was fourteen years old at that time of the shooting, only briefly observed the suspect and provided a very limited description of the suspect before identifying Brown from the photo array and gang book approximately 10 months after the shooting. See United States v. Pantoliano, 2010 WL 6371969,  *4 (E.D.N.Y. 2010), adopted 2011 WL 1225980 (E.D.N.Y. 2011) (finding that a suggestive showup was not independently reliable where "the witness had no prior familiarity with the robber and saw him only for moments, outdoors after dark, while he was wearing a hood" and provided only a limited description of the suspect). Suggesting that the gang book identification was merely the product of the photo array identification that occurred minutes earlier, the witness specifically said "[t]hat is the individual that's in the photo array",  when identifying Brown from the gang book. [470],  pp. 14-15, 40.  See Simmons v. United States, 390 U.S. 377, 383-84  (1968) ("Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the

image of the photograph rather than of the person actually seen, reducing the trustworthiness of

subsequent lineup or courtroom identification").  Therefore, I conclude that there is no

independent reliability to either identification.


**C.      Brown's Request to Reopen the Hearing to Present Additional Evidence**.

In his post-hearing submission, Brown requests that the evidentiary hearing be

reopened to: 1) recall Detective Ross to testify;  2) call Detective Mordino, who took the witness's

June 14, 2011 statement, to testify; 3) call a witness identified in an *in camera* submission to

testify [481]; and 4) present the expert report of Charles Goodsell, Ph.D., which is attached to his

submission. [490], pp. 27-28.[4]  However, based upon my recommendation that the identifications

be suppressed, it is unnecessary for me to address whether the hearing be reopened.[5]


## CONCLUSION

For these reasons, I recommend that Brown's motion to suppress the pretrial

identifications and anticipated identification at trial (Musitano Affirmations [225], pp. 34-36,

¶¶70-76; [270], pp. 4-6, ¶¶8-15) be granted.  Unless otherwise ordered by Judge Skretny, any

objections to this Report and Recommendation must be filed with the clerk of this court by

November 20, 2015 (applying the time frames set forth in Fed. R. Crim. P. ("Rules") 45(a)(1)(C),

45(c), and 59(b)(2)).  Any requests for extension of this deadline must be made to Judge Skretny.

---

[4]      To be clear, I have not considered Dr. Goodsell's report ([490], pp. 32-41 of 41) or the
references to it in Brown's Post-Hearing Brief  in issuing my recommendation.

[5]      If it is determined that the array is not suggestive on its face, any additional issues
concerning whether the identification procedure was suggestive may be reserved until trial. *See* United
States v. Walia, 2014 WL 3734522, at *21 (E.D.N.Y. 2014).

A party who "fails to object  timely . . . waives any right to further judicial review of [this] decision".   Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

DATED:  November 3, 2015

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge